IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DERECK E. STONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-711-SLR |
| | ) |
| DR. LAWRENCE MCDONALD, et al., | ) |
| | ) |
| Defendants. | ) |

Dereck E. Stones, Sussex Correctional Institution, Georgetown, Delaware. Pro se Plaintiff.

Daniel A. Griffith, Esquire, Whiteford, Taylor & Preston, LLC, Wilmington, Delaware. Counsel for Defendants Dr. Lawrence McDonald and Correct Care Solutions.

Kenisha LaShelle Ringgold, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants G. R. Johnson and Carl C. Danberg.

**MEMORANDUM OPINION**

Dated: January ℐ, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Dereck E. Stones ("plaintiff"), an inmate at the Sussex Correctional Institute ("SCI"), Georgetown, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983. (D.I. 3) He proceeds pro se and has been granted leave to proceed in forma pauperis. Presently before the court are plaintiff's motions to compel (D.I. 44, 49), request for counsel (D.I. 64), and motion to appoint expert (D.I. 65); State defendants' motion for judgment on the pleadings (D.I. 37) and motion for summary judgment (D.I. 70); and medical defendants' motion to strike (D.I. 53) and motion for summary judgment (D.I. 68). The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the court will: (1) deny as moot State defendants' motion for judgment on the pleadings (D.I. 37) and medical defendants' motion to strike (D.I. 53); (2) deny plaintiff's motions to compel (D.I. 44, 49), request for counsel (D.I. 64), and motion to appoint expert (D.I. 65); and (3) grant medical defendants' motion for summary judgment (D.I. 68) and State defendants' motion for summary judgment (D.I. 70).

## II. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff filed his complaint on June 5, 2012 alleging defendants deliberately delayed addressing a serious medical need and/or failed to address the condition. In addition, the complaint alleges that Delaware Department of Correction ("DOC") has a policy of entering into contracts for medical care with for-profit providers that place the bottom-line ahead of an inmate's medical needs. (D.I. 3) Named as defendants are Dr. Lawrence McDonald ("Dr. McDonald") and Correct Care Solutions ("CCS") (together "medical defendants"), and Warden G. R. Johnson ("Johnson") and Carl C. Danberg

("Danberg"), former DOC Commissioner (together "State defendants").[1]  Plaintiff seeks injunctive relief in the form of medical care, as well as compensatory and punitive damages.

CCS is the contract medical provider for the DOC.  Plaintiff testified that in July or August 2010, he injured the nerves in his left ankle and foot when his foot slipped off a curb, and he rolled his ankle.  (D.I. 3; D.I. 69, ex. A at 10)  Plaintiff's medical records indicate that he presented to SCI medical on August 12, 2010 regarding the injury.  (D.I. 69, ex. B at DOC129)  The injury caused permanent nerve damage to plaintiff's left lower extremity.  (*Id.* at DOC436-437)  Plaintiff submitted numerous slips for medical care from 2010 through 2013, the majority of which sought renewal of medications, some that contained bottom-bunk requests, and several with specific requests for foot or ankle care, those specifically dated October 19, 2010, April 25, 2011, November 29, 2011, December 15, 2011, February 5 and 28, 2012, March 31, 2012, October 16, 2012, November 1, 2013 and May 9, 2013.  (D.I. 58 at DOC206-279, 281-285, 475-477, 479-505, 507-519, 520-25, 526-533, 534-36, 539-540, 550, 552-563)  Plaintiff submitted two grievances seeking medical care for his ankle/foot, one on May 27, 2011 and the other on December 28, 2011.  (D.I. 27 at DOC 176-185)  The first grievance sought an MRI and the second grievance sought immediate corrective surgery without further delay.  (*Id.*)

CCS progress notes indicate that plaintiff was either seen by medical personnel or had his medical records reviewed in:  (1) 2010 on August 12 and 19, and November

---

[1]Plaintiff voluntarily dismissed the claims against defendant Correctional Medical Services, Inc. (*See* D.I. 55)

2

4; (2) 2011 on January 27 and 29, February 7 and 22, March 28, April 27, June 1, 28, and 29, August 8 and 30, September 9 and 26, October 20, November 4, and December 9 and 13; (3) 2012 on February 9, 14, 15, March 8, June 21, and November 8; and (4) 2013 on January 23, February 22, May 2, and May 22. (D.I. 58 at DOC265, 280, 307, 307, 311-314, 567, 568, 572-78, 580-83) There were two physician's orders in 2010, and numerous other physician's orders in 2011, 2012, and 2013. (*Id.* at DOC255, 257, 258, 452, 453, 455-59, 463, 466, 467, 469, 470) Finally, Dr. McDonald, as well as other CCS medical personnel, submitted outpatient referral requests for plaintiff on numerous occasions throughout 2011. (*Id.* at DOC232, 237, 238, 243-245, 248, 249, 412, 418, 421, 422, 424, 427, 432, 440, 446)

Subsequent to the injury, plaintiff's left foot and ankle were x-rayed on August 19, 2010 and March 16, 2011, an EMG study was performed on June 29, 2011, and an MRI of the left ankle and left foot was conducted on August 30, 2011. (D.I. 69, ex. B at 119, 120, 129, 230, 439) X-ray findings were normal, the EMG studies of the left peroneal nerve were normal for latencies with moderate to severely diminished amplitudes distally and decrement in amplitude across the fibular head, and the MRI revealed nerve damage common peroneal nerve left - motor neuropathy and lateral ankle ligament tears. (*Id.*)

The first request for medical care following the injury occurred on October 19, 2010 when plaintiff complained of "having problems with my (left ankle) again. It keeps "'rolling/twisting' when I walk at times." (D.I. 72 at A50) Plaintiff was seen on November 4, 2010, and told to increase his exercises, avoid running and wear support boots, and he was scheduled for a follow-up in 90 days. (*Id.* at A65)

3

A CCS outpatient referral request dated February 17, 2011 states, "needs physical therapy for home progress for increased . . . strength." (D.I. 58 at DOC248) Dr. McDonald referred plaintiff to physical therapy at Tidewater Physical Therapy, an initial evaluation took place on February 28, 2011, and plaintiff was given a home exercise program. (D.I. 69, ex. B at DOC231, 241-42; D.I. 72 at A33-34) The plan included physical therapy two times per week for four weeks with a long term goal of independent home exercises. (D.I. 69, ex. B at DOC241-242) The off-site return progress note stated, "needs ongoing PT to correct deficits." (D.I. 58 at DOC246) A CCS consult sheet with the same date contains the name notation. (*Id.* at 247) A CCS consult sheet dated March 25, 2011, recommends physical therapy three times per week for four weeks at Old Town Physical Therapy. (D.I. 75, ex. C) Medical records indicate that plaintiff performed exercises, but do not reflect that plaintiff was sent to an outside physical therapist. (D.I. 72 at A24, 63, 65)

Dr. McDonald referred plaintiff to an outside neurologist. Prior to his visit with the neurologist, plaintiff was issued an ankle support from the medical department. (D.I. 72, A127) Plaintiff was seen by neurologist Dr. William Thomas ("Dr. Thomas") on June 29, 2011, who performed an EMG. (D.I. 69, ex. B at DOC230, 239) Dr. Thomas reviewed medical testing that included motor nerve studies of the left peroneal nerve that indicated moderate to severely diminished amplitudes distally and decrement in amplitude across the fibular head. (*Id.* at DOC 230) Dr. Thomas' impression was "acute on chronic severe left peroneal mononeuropathy secondary to entrapment and/or traction injury proximally across the fibular head." (*Id.* at DOC230) Dr. Thomas

4

recommended an orthopedic surgical evaluation and management of the problem

peroneal nerve entrapment. (*Id.*)

On August 8, 2011, plaintiff was seen by outside orthopaedic physician Dr.

Roman Orsini ("Dr. Orsini") of Orthopaedic Associates of Southern Delaware. Dr. Orsini

evaluated plaintiff and ordered an MRI. (D.I. 72 at A37) Dr. Orsini stated that "the

peroneal nerve is clearly damaged" and "surgery may be impending." (*Id.* at A37-38)

He also prescribed an AFO (i.e., ankle-foot orthotic) brace to be fabricated for plaintiff's

left foot and ankle. (*Id.* at A43) When plaintiff saw Dr. Orsini on September 9, 2011, he

told Dr. Orsini that he felt the prison should have diagnosed him sooner and sent him to

the doctor. (D.I. 69, ex. B at DOC436) Plaintiff blamed the prison for his nerve

damage. (*Id.*) Dr. Orsini's plan for that date states:

> We discussed treatment at length. Unfortunately, I do not believe that the
> nerve can be fixed. Once nerve damage occurs to this degree
> decompressing it will fail. This was discussed at length and the patient
> was truly upset by this news. He again reiterated that it is his belief that it
> was the jails [sic] fault that he is in this situation. I have advised him in no
> uncertain terms that there is no[] fault [to] be had, he was injured, nerve
> damage occurred. . . . we discussed the ankle ligaments. These are
> clearly torn and repair will create stability, however, we cannot repair the
> fact that his anterior and lateral compartments are not working and
> therefore I believe that his best treatment at this juncture would be to
> avoid lateral ankle stabilization and utilize a brace. If he does well with the
> brace, no treatment will be necessary; if he does not do well, a lateral
> ankle stabilization could be required.

*Id.*

Plaintiff received his brace on November 1, 2011, but he did not like its height.

(D.I. 72 at A102) Plaintiff was advised to try the brace for two weeks and to follow-up

with Dr. McDonald. (*Id.* at A116) Although medical did not believe the height was an

issue, it ordered another fabricated brace. (*Id.* at A102) In December, plaintiff received

another brace but, again, did not like the fit and complained that the brace caused scarring. (Id. at A114) On December 28, 2011 plaintiff filed a grievance, complaining that the pain and discomfort he was experiencing was due to a delay in treatment. Plaintiff also requested that he "undergo immediate corrective surgery without further delay." (Id. at A56)

When Dr. Orsini evaluated plaintiff on August 6, 2012, he advised plaintiff that he could not fix the problem and that, while a peripheral nerve decompression could be performed, he doubted "it would be worth it." (D.I. 69, ex. B at DOC 121) Dr. Orsini encouraged plaintiff to wear a brace at all times and noted that Neurontin[2] appeared to be helping with the neuritic pain. (Id.) Dr. Orsini opined that "as long as he continues to do well with the brace, no further treatment is necessary." (Id.)

On February 22, 2013, plaintiff was seen by Dr. Orsini who evaluated him and issued a prescription for special shoes. (Id. at A45-47) As of March 19, 2013, Dr. Orsini assessed plaintiff with peroneal nerve damage left, drop foot left, left ankle instability, and burning neuropathy. (Id. at ex. B at DOC406-7) Dr. Orsini's notes state:

> I reiterated to him today that there is no issue with the damage to his leg and treatment which he had received. He has nerve damage. This would not have changed regardless to when he was or was not seen. We next discussed instability. I would like to see him once he has his new shoes.

---

[2]A drug indicated for the management of postherpetic neuralgia (i.e., nerve pain) in adults. See www.pfizer.com at NEURONTIN U.S. Medication Guide.

Bracing will be maintain [sic].  Surgery is an option, but not recommended
at this juncture.

*Id.* at 407.

When plaintiff was deposed, he testified that his current regimen for treatment is

medication (Neurontin and Meloxicam[3]) on a daily basis.  Plaintiff acknowledged that

State defendants were not directly involved in his medical treatment.  (D.I. 72,

A142-145)  Plaintiff did not speak to either Johnson or Danberg about his medical

treatment.  (*Id.* at A139-140)  Plaintiff also testified that, at one point, he wrote and sent

a letter to Johnson but was unable to recall when the letter was written or when he sent

it.  (*Id.* at A140)  Plaintiff named Johnson as a defendant because "it's [his] belief that he

is responsible that inmates get the adequate medical care at SCI prison".  (*Id.* at A141)

Plaintiff named Danberg as a defendant  "because he is responsible for hiring these

private profit providers to take care of the inmate health throughout the Department of

Correction[] in the State of Delaware."  (*Id.* at A143)  Plaintiff also testified that he sued

Danberg because he "put  his signature on the policy to hire [CCS]."  (*Id.* at A143-44)

During his deposition, plaintiff testified there was a policy with the health care providers,

but he could not point to a specific policy.  (*Id.* at A141-143)

According to Danberg, he "sought to provide inmates with healthcare that was at

or above that required by the National Commission on Correctional Healthcare

("NCCHC").  (*Id.* at A21-22)  During his tenure as Commissioner, the DOC did not adopt

policies or practices that encouraged CCS to provide constitutionally deficient care.  (*Id.*

---

[3]A non-steroidal anti-inflammatory drug used to treat arthritis.  It reduces pain,
swelling, and stiffness of the joints.  *See* www.wedmd.com/drugs/drug-911-meloxicam.

7

at A21) The NCCHC accreditation was important to the DOC because the NCCHC provides independent auditing and review of prison healthcare services. If the prison meets its standards, the NCCHC provides accreditation to the institution. (*Id.*) The contract between CCS and the DOC required that CCS maintain NCCHC accreditation (*Id.*) The actual expenditures of state funds on medical care increased by over 4 million dollars during the fiscal year 2012. (*Id.*)

## III. MISCELLANEOUS MOTIONS

### A. Request for Counsel

Plaintiff requests counsel (D.I. 64) on the grounds that he is unskilled in the law, no longer has assistance from other inmates, recently received his medical records, the issues are complex, and he has limited access to the law library. A pro se litigant proceeding in forma pauperis has no constitutional or statutory right to representation by counsel.[4] *See Brightwell v. Lehman*, 637 F.3d 187, 192 (3d Cir. 2011); *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993). However, representation by counsel may be appropriate under certain circumstances after a finding that a plaintiff's claim has arguable merit in fact and law. *Tabron*, 6 F.3d at 155.

After passing this threshold inquiry, the court considers a number of factors when assessing a request for counsel, including:

(1) the plaintiff's ability to present his or her own case;
(2) the difficulty of the particular legal issues; (3) the degree
to which factual investigation will be necessary and the ability

---

[4]*See Mallard v. United States Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989) (§ 1915(d) (now § 1915(e)(1)) does not authorize a federal court to require an unwilling attorney to represent an indigent civil litigant, the operative word in the statute being "request.").

of the plaintiff to pursue investigation; (4) the plaintiff's capacity
to retain counsel on his own behalf; (5) the extent to which a
case is likely to turn on credibility determinations; and
(6) whether the case will require testimony from expert witnesses.

*Tabron*, 6 F.3d at 155-57; *accord Parham v. Johnson*, 126 F.3d 454, 457 (3d Cir. 1997);

*Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).

To date, plaintiff's filings indicate that he possesses the ability to adequately

pursue his claims. Upon consideration of the record, the court is not persuaded that

representation by an attorney is warranted. In addition, as will be discussed, the

evidence of record indicates that plaintiff cannot prevail on his claim. Therefore, the

court will deny the request for counsel.

### B. Discovery Motions

Plaintiff filed two motions to compel defendants to produce certain discovery.

(D.I. 44, 49) The court has reviewed the discovery provided to plaintiff and finds that,

with regard to the first motion to compel (D.I. 44), he was provided the documents

requested. With regard to the second motion to compel (D.I. 49), CCS has adequately

responded to all discovery requests.

CCS moves to strike (D.I. 53) requests for admissions (D.I. 50) served upon it by

plaintiff. CCS, however, responded to the requests for admissions. (*See* D.I. 61)

Accordingly, the motion to strike is moot.

For the above reasons, the court will deny the motions to compel and the motion

to strike.

### C. Motion to Appoint Expert

Plaintiff requests appointment of a medical expert witness (D.I. 65) on the

9

grounds that Dr. Orsini provided inconsistent reports, defendants failed to provide him with recommended physical therapy, and due to the serious and permanent nature of his injury. Although the court has broad discretion to appoint an independent expert under Rule 706, "[t]he policy behind the rule is to promote the jury's factfinding ability." *Ford v. Mercer Cnty. Corr. Ctr.*, 171 Fed. App'x. 416, 420 (3d Cir. 2006) (unpublished). "'The most important factor in favor of appointing an expert is that the case involves a complex or esoteric subject beyond the trier-of-fact's ability to adequately understand without expert assistance.'" *Id.* (citation omitted). Thus, "[a] trial judge does not abuse his [or her] discretion in declining to appoint an independent expert" if it determines that the expert is "solely to benefit a party who has otherwise failed to gather such evidence as would suffice to" prove his claims. *Id.* Moreover, Rule 706 is not intended to ensure that indigent plaintiffs have access to expert witnesses in order to make their case. Here, plaintiff seeks an expert because he believes physician's reports are inconsistent and because he was not provided with physical therapy. Plaintiff, however, did not present evidence that an expert is necessary for the court's benefit.[5]

Given that an expert witness is not presently required to assist in the jury's role as factfinder, the court will deny plaintiff's motion for appointment of a medical expert witness.

---

[5]Even were an expert witness necessary, "pro se inmates proceeding in forma pauperis must pay for the expenses involved in their civil actions," and plaintiff has provided no indication that he has the ability to pay such costs. *See Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir. 1987) (finding no authority for court to pay for expert witnesses of pro se plaintiff proceeding in forma pauperis).

10

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990)).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

11

(1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Medical defendants move for partial summary judgment on the grounds that plaintiff failed to:  (1) develop any evidence to support the necessary elements of an Eighth Amendment claim; (2) produce the necessary medical expert opinion to establish a serious medical need and the medical defendants' deliberate indifference to it; and (3) develop any evidence CCS maintained a custom or policy of deliberate indifference. State defendants move for summary judgment on the grounds that:  (1) the claims against them in their official capacities are barred by the Eleventh Amendment; (2) they cannot be held liable under § 1983  because they were not personally involved in the alleged deprivation of plaintiff's constitutional rights; (3) plaintiff's theory of supervisory liability is not viable after *Iqbal*; (4) plaintiff has failed to support a supervisory claim against either State defendant based upon a policy or practice theory of liability; (5) plaintiff's disagreement with medical recommendations as to proper medical treatment does not give rise to a constitutional claim; and (6) they are immune from liability under the doctrine of qualified immunity.  Plaintiff opposes the motions arguing that, with respect to medical defendants, they delayed and denied him medical treatment including pain medication, physical therapy, and recommended surgery and, with respect to State defendants, there remain genuine issues of material fact and State defendants have not provided all necessary discovery.

12

## B. Discussion

### 1. Eleventh Amendment

Plaintiff names State defendants in their official capacities. The Eleventh Amendment of the United States Constitution protects an unconsenting State or state agency from a suit brought in federal court by one of its own citizens, regardless of the relief sought. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651 (1974). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted); *Ali v Howard*, 353 F. App'x 667, 672 (3d Cir. 2009) (unpublished). Accordingly, § 1983 claims for monetary damages against a State, state agency, or a state official in his official capacity are barred by the Eleventh Amendment. *See id.* However, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *See Ex parte Young*, 209 U.S. 123 (1908). "This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations omitted).

The State of Delaware has neither consented to plaintiff's suit nor waived its immunity. Further, as will be discussed, the record does not support a finding that either Johnson or Danberg acted in violation of federal law to warrant injunctive relief. Therefore, the court will grant State defendants' motion for summary judgment as to the claims raised against them in their official capacities.

13

### 2. Medical needs

#### a. Deliberate indifference

All defendants move for summary judgment on the grounds that plaintiff cannot establish an Eighth Amendment claim against them. Plaintiff argues that medical defendants delayed and denied him medical care and that there remain genuine issues of material fact as to the claims against State defendants.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104. Serious medical needs are those that have been diagnosed by a physician as requiring treatment or are so obvious that a lay person would recognize the necessity for medical attention, and those conditions which, if untreated, would result in a lifelong handicap or permanent loss. *See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Deliberate indifference requires more than mere negligence or lack of due care. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To demonstrate deliberate indifference, the plaintiff must demonstrate that the defendant was "subjectively aware of the risk" of harm to the plaintiff. *See Farmer*, 511 U.S. at 828. The plaintiff must allege acts or omissions that are sufficiently harmful to offend "evolving standards of decency." *Estelle v. Gamble*, 429 U.S. at 106.

"Mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). In addition, an

14

inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf.  *Id.* at 107.

The record reflects that plaintiff has a serious medical need, having been diagnosed with peroneal nerve damage left, drop foot left, left ankle instability, and burning neuropathy.  The record further demonstrates that plaintiff has been provided with ongoing care.  Plaintiff was injured in August 2010 and was seen within a very short time-frame by medical personnel.  The record reflects that plaintiff first sought additional treatment for his foot/ankle on October 19, 2010.  Subsequent to that date, the medical record is replete with documentation showing that plaintiff was provided with medical care at the prison, referrals to outside specialists, treatment by outside specialists, diagnostic testing, and medical devices.

There were recommendations that plaintiff undergo outside physical therapy, but there is no indication in the record that it was provided.  Nonetheless, the record reflects that when plaintiff was referred to physical therapy, he was given a regimen of exercises to perform.  At most, medical defendants were negligent in not sending plaintiff for physical therapy outside the prison.  Negligence, however, does not rise to the level of a constitutional violation.  Moreover, in light of the other extensive medical care provided plaintiff, no reasonable jury could find that defendants were deliberately indifferent to plaintiff's medical needs.  Finally, plaintiff contends that surgery is required to correct his medical problems.  However, Dr. Orsini stated on at least three occasions, the last time on March 19, 2013, that surgery is an option, but is not recommended at this juncture.

15

Although plaintiff disagrees, and believes that surgery is necessary, "mere

disagreement as to the proper medical treatment" is insufficient to state a constitutional

violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

The record indicates that plaintiff received continual medical care for the medical

conditions at issue.  The record does not support a finding that defendants were

deliberately indifferent to plaintiff's medical needs or that they violated plaintiff's

constitutional rights.  Instead, the record indicates that steps were taken to see that

plaintiff received adequate medical care.  Therefore, the court will grant defendants'

motion for summary judgment on the medical needs issue.

### b. CCS policy

With regard to CCS, In order to establish that CCS is directly liable for any

alleged constitutional violations, plaintiff "must provide evidence that there was a

relevant [CCS] policy or custom, and that the policy caused the constitutional violation[s]

[plaintiff] allege[s]." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir.

2003) (because respondeat superior or vicarious liability cannot be a basis for liability

under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held

liable for the acts of its employees and agents under those theories).

Plaintiff failed to identify a policy that allegedly violated his constitutional rights.

Moreover, because the court has concluded that there was no violation of plaintiff's

constitutional rights under the Eighth Amendment, CCS cannot be liable based on the

theory that it established or maintained an unconstitutional policy or custom responsible

for violating plaintiff's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105,

113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's

16

alleged deliberate indifference to prisoner's serious medical needs where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights). In light of the foregoing, the court will grant medical defendants' motion for summary judgment as to CCS.

### c. Personal involvement/respondeat superior

State defendants move for summary judgment on the grounds that they had no personal involvement in the alleged constitutional violations and they cannot be held liable under a theory of respondeat superior. Plaintiff alleges that State defendants are responsible for ensuring that inmates at SCI received adequate medical care and that there is a policy of delaying medical care for serious medical needs. He opposes the motion for summary judgment on the grounds that there remain genuine issues of material fact. In addition, plaintiff contends that State defendants failed to produce all required discovery.[6]

The record reflects that State defendants had no personal involvement with regard to plaintiff's medical care. A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."

---

[6]Plaintiff's position that he did not receive necessary discovery is not well-taken. State defendants provided plaintiff copious amounts of discovery, over 600 pages. (*See* D.I. 27, 58) Notably, the production of documents includes the contract entered into between CCS and the DOC.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In addition, a § 1983 claim cannot be premised upon a theory of respondeat superior and, in order to establish liability for deprivation of a constitutional right, a party must show personal involvement by each defendant. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675-77 (2009); *Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60, 71-72 (3d Cir. 2011). "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. In *Iqbal*, the Supreme Court emphasized that "[i]n a § 1983 suit - here masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.

Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of specific facts showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights or created such policies where the subordinates had no discretion in applying the policies in a fashion other than the one which actually produced the alleged deprivation; *e.g.,* supervisory liability may attach if the plaintiff asserts facts showing that the supervisor's actions were "the moving force" behind the harm suffered by the plaintiff. *See Sample v. Diecks*, 885 F.2d 1099, 1117-118 (3d Cir. 1989); *see also Iqbal*, 566 U.S. at 677-686.

The evidence of record is that neither Johnson nor Danberg had any involvement in plaintiff's medical care. Nor was plaintiff able to identify any policies that produced any alleged constitutional violation. There is no evidence of record that Johnson or

18

Danberg violated plaintiff's constitutional rights, that they expressly directed the

deprivation of his constitutional rights, or that they created policies wherein subordinates

had no discretion in applying them in a fashion other than the one which actually

produced the alleged deprivation.

In addition, although plaintiff believed that he may have written to Johnson about

his medical condition, he did know the time-frame when he sent the letter.  It is

well-established that non-medical prison staff may not be "considered deliberately

indifferent simply because they failed to respond directly to the medical complaints of a

prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991

F.2d 64, 69 (3d Cir. 1993).  The rationale for this rule has been aptly explained by the

United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts . . . , a non-medical
> prison official will generally be justified in believing that the prisoner is in
> capable hands.  This follows naturally from the division of labor within a
> prison.  Inmate health and safety is promoted by dividing responsibility for
> various aspects of inmate life among guards, administrators, physicians,
> and so on.  Holding a non-medical prison official liable in a case where a
> prisoner was under a physician's care would strain this division of labor.
> Moreover, under such a regime, non-medical officials could even have a
> perverse incentive not to delegate treatment responsibility to the very
> physicians most likely to be able to help prisoners, for fear of vicarious
> liability.  Accordingly, we conclude that, absent a reason to believe (or
> actual knowledge) that prison doctors or their assistants are mistreating
> (or not treating) a prisoner, a non-medical prison official . . . will not be
> chargeable with the Eighth Amendment scienter requirement of deliberate
> indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  Courts have repeatedly held that,

absent some reason to believe that prison medical staff are mistreating prisoners,

non-medical corrections staff who refer inmate medical complaints to physicians may

19

not be held personally liable for medically-based Eighth Amendment claims. *See Spruill*, 372 F.3d 218; *Durmer*, 991 F.2d 64.

Applying the law and the undisputed facts, no reasonable jury could find in favor of plaintiff. Therefore, the court will grant State defendants' motion for summary judgment.

### 3. Cost containment

Plaintiff alleges that defendants' actions were not motivated by medical necessity but were motivated by the desire to cut cost and maximize profit, or other improper purposes unrelated to medical necessity. Plaintiff makes broad generalizations, but failed to identify specific policies or practices to support his claims. Nor is there evidence of record that there were any cost containment practices or, assuming arguendo there were, evidence indicating that officials knew or had any reason to believe that prison medical staff were not treating or were mistreating inmate, or that officials were indifferent to known risks caused by their cost containment practices. S*ee Estate of Chance v. First Corr. Med.*, 329 F. App'x 340 (3d Cir. 2009) (unpublished) (State prison officials were not deliberately indifferent to inmate's serious medical condition, in violation of Eighth Amendment, as result of their cost containment practices, where there was no evidence indicating that officials knew or had any reason to believe that prison medical staff were not treating or were mistreating inmate, or that officials were indifferent to known risks caused by their cost containment practices.) Notably, the evidence of record indicates that DOC medical costs increased during fiscal year 2012.

For the above reasons, the court will grant State defendants' motion for summary judgment on this issue.

## V. CONCLUSION

For the above reasons, the court will: (1) deny as moot State defendants' motion for judgment on the pleadings (D.I. 37)[7] and medical defendants' motion to strike (D.I. 53); (2) deny plaintiff's motions to compel (D.I. 44, 49), request for counsel (D.I. 64), and motion to appoint expert (D.I. 65); and (3) grant medical defendants' motion for summary judgment (D.I. 68) and State defendants' motion for summary judgment (D.I. 70).

An appropriate order will issue.

---

[7]Because the court will grant State defendants' motion for summary judgment, it sees no need to address the merits of State defendants' motion for judgment on the pleadings. (D.I. 42) Nor will the court address State defendants' qualified immunity argument, given that summary judgment will be granted to defendants on other grounds. The court notes, however, that plaintiff is not required to produce an expert witness when he claims an Eighth Amendment violation, as opposed to a State medical malpractice claim.

21